## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| SOVERAIN IP, LLC, | |
| Plaintiff, | |
| | Case No.:  2:17-cv-00204-RWS-RSP |
| v. | **Lead Case / Member Case** |
| MICROSOFT CORPORATION, | JURY TRIAL DEMANDED |
| Defendant. | |

### MICROSOFT CORPORATION'S ANSWER TO PLAINTIFF'S "COMPLAINT FOR PATENT INFRINGEMENT"

Defendant Microsoft Corporation ("Microsoft") answers the "Complaint for Patent Infringement" of Plaintiff Soverain IP, LLC ("Soverain" or "Plaintiff") as set forth herein and provides defenses thereto and counterclaims.  Microsoft denies any alleged infringement of the patents asserted in the Complaint.

## I.   ANSWER TO PLAINTIFF'S COMPLAINT

1.   Microsoft denies that it has infringed any of the patents asserted in the Complaint. Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 1 of the Complaint and therefore denies the same.

2.   Microsoft denies the allegations of paragraph 2.

3.   Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 3 of the Complaint and therefore denies the same.

4.      Microsoft denies the infringement allegations.  Microsoft is otherwise without knowledge or information sufficient to form a belief regarding the allegations in paragraph 4 of the Complaint and therefore denies the same.

5.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 5 of the Complaint and therefore denies the same.

6.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 6 of the Complaint and therefore denies the same.

7.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 7 of the Complaint and therefore denies the same.

8.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 8 of the Complaint and therefore denies the same.

9.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 9 of the Complaint and therefore denies the same.

10.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 10 of the Complaint and therefore denies the same.

11.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 11 of the Complaint and therefore denies the same.

12.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 12 of the Complaint and therefore denies the same.

13.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 13 of the Complaint and therefore denies the same.

14.      Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 14 of the Complaint and therefore denies the same.

15.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 15 of the Complaint and therefore denies the same.

16.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 16 of the Complaint and therefore denies the same.

17.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 17 of the Complaint and therefore denies the same.

18.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 18 of the Complaint and therefore denies the same.

19.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 19 of the Complaint and therefore denies the same.

20.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 20 of the Complaint and therefore denies the same.

21.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 21 of the Complaint and therefore denies the same.

22.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 22 of the Complaint and therefore denies the same.

23.     Microsoft admits that at least one of the "Soverain Patents" has been cited on the face of at least one Microsoft patent or patent application.  Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 23 of the Complaint and therefore denies the same.

24.     Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "Soverain's patents," Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 24 and thus denies the same.  To

the extent the term "Soverain's patents" refers to the patents asserted in the Complaint, Microsoft denies the allegations in paragraph 24 of the Complaint.

25.     Microsoft denies that the patents in suit are valid.  Microsoft is otherwise without knowledge or information sufficient to form a belief regarding the allegations in paragraph 25 of the Complaint and therefore denies the same.

26.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 26 of the Complaint and therefore denies the same.

27.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 27 of the Complaint and therefore denies the same.

28.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 28 of the Complaint and therefore denies the same.

## THE PARTIES

29.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 29 of the Complaint and therefore denies the same.

30.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 30 of the Complaint and therefore denies the same.

31.     For purposes of this action only, Microsoft admits that a Complaint filed by Microsoft Technology Licensing, LLC against Kyocera Corporation and Kyocera Communications, Inc. in Case No. 15-cv-00346 (W.D. Wash.) included the material quoted in paragraph 31. Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 31 of the Complaint and therefore denies the same.

32.     For purposes of this action only, Microsoft admits that it has asserted some patents it owns in federal courts, including the district court for the Eastern District of Texas. Microsoft denies that all of the cases cited in paragraph 32 of the Complaint were cases in which Microsoft asserted a Microsoft patent in a federal court.  Microsoft denies any remaining allegations in paragraph 32 of the Complaint.

33.     For purposes of this actions only, Microsoft admits the allegations of paragraph 33.

34.     For purposes of this action only, Microsoft admits that it operates some facilities, offices, and/or retail stores in Texas, including:  a Technology Center in Irving, sales offices in Austin, San Antonio, Houston, and Dallas, retail stores in Austin, San Antonio, Houston, Friendswood, The Woodlands, Frisco, McAllen, Dallas, and Frisco, and an Azure datacenter in San Antonio.  Microsoft denies the remaining allegations of paragraph 34.

35.     Microsoft denies the allegations of paragraph 35.

## JURISDICTION AND VENUE

36.     Microsoft admits that the Complaint purports to initiate an action under the patent laws of the United States, Title 35 of the United States Code.  Microsoft is without knowledge or information sufficient to form a belief regarding the allegations of subject matter jurisdiction in paragraph 36 of the Complaint and therefore denies the same.  Microsoft denies all other allegations in paragraph 36 of the Complaint.

37.     For purposes of this action only, Microsoft admits that it is registered to do business in the State of Texas, that it has offices and facilities in the State of Texas, and that it has customers located in the State of Texas.  For purposes of this action only, Microsoft admits

that it is subject to this Court's personal jurisdiction.  Microsoft denies the remaining allegations

of paragraph 37.

38.     Microsoft denies the allegations of paragraph 38.

## TECHNOLOGY BACKGROUND

## U.S. PATENT NO. 7,191,447

39.     Microsoft admits that according to its face, United States Patent No. 7,191,447

("the '447 patent") is titled "*Managing Transfers of Information in a Communications Network,*"

that the application that issued as United States Patent No. 7,191,447 was filed on August 25,

2000 and attempted to claim priority to an earlier application filed on October 25, 1995.

Microsoft admits that the '447 patent on its face states that, subject to any disclaimer, the term of

the patent is extended under 35 U.S.C. § 154(b) by 615 days.  Microsoft admits that a copy of the

'447 patent purports to be attached to the Complaint as Exhibit A.  Microsoft denies all other

allegations in paragraph 39 of the Complaint.

40.     Microsoft admits that the claims of the '447 patent were subject to *inter partes*

reexamination, that the reexamination certificate confirming the claims was issued on October 5,

2012, and that 83 additional claims were added and allowed during the reexamination.  Microsoft

denies all other allegations in paragraph 40 of the Complaint.

41.     Microsoft admits that during an *inter partes* reexamination proceeding of the '447

patent, the United States Patent and Trademark Office Board of Patent Appeals and Interferences

reversed the Examiner's decision to reject claims over various combinations of four references.

Microsoft denies all other allegations in paragraph 42 of the Complaint.

42.     Microsoft is without knowledge or information sufficient to form a belief

regarding the allegations in paragraph 42 of the Complaint and therefore denies the same.

43.     Microsoft is without knowledge or information sufficient to form a belief that any issued patent assigned to Microsoft cited to the '447 patent and therefore denies the same. Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 43 of the Complaint and therefore denies the same.

## U.S. PATENT NO. 8,606,900

The Complaint includes an unnumbered paragraph between paragraphs 43 and 44.  To the extent a response is required, Microsoft responds as follows:  Microsoft admits that according to its face, United States Patent No. 8,606,900 ("the '900 patent") is titled "Method and System for Counting Web Access Requests," that the application that issued as the '900 patent was filed on April 12, 2000 and issued on December 10, 2013.  Microsoft admits that the '900 patent on its face states that, subject to any disclaimer, the term of the patent is extended under 35 U.S.C. § 154(b) by 1645 days.  Microsoft admits that a copy of the '900 patent purports to be attached to the Complaint as Exhibit B.  Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in the unnumbered paragraph between paragraphs 43 and 44 of the Complaint and therefore denies the same.

44.     Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 44 of the Complaint and therefore denies the same.

45.      Microsoft is without knowledge or information sufficient to form a belief that any issued patent assigned to Microsoft cited to the '900 patent and therefore denies the same. Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 45 of the Complaint and therefore denies the same.

7

## U.S. PATENT NO. 8,935,706

46.     Microsoft admits that according to its face, United States Patent No. 8,935,706

("the '706 patent") is titled "Managing Transfers of Information in a Communications Network,"

that the application that issued as the '706 patent was filed on September 29, 2008 and issued on

January 13, 2015.  Microsoft admits that a copy of the '706 patent purports to be attached to the

Complaint as Exhibit C.  Microsoft is without knowledge or information sufficient to form a

belief regarding the remaining allegations in paragraph 46 of the Complaint and therefore denies

the same.

47.     Microsoft is without knowledge or information sufficient to form a belief

regarding the remaining allegations in paragraph 47 of the Complaint and therefore denies the

same.

48.     Microsoft is without knowledge or information sufficient to form a belief

regarding the remaining allegations in paragraph 48 of the Complaint and therefore denies the

same.

49.     Microsoft is without knowledge or information sufficient to form a belief that any

issued patent assigned to Microsoft cited to the '706 patent and therefore denies the same.

Microsoft is without knowledge or information sufficient to form a belief regarding the

remaining allegations in paragraph 49 of the Complaint and therefore denies the same.

## U.S. PATENT NO. 5,708,780

The Complaint includes an unnumbered paragraph between paragraphs 49 and 50.  To

the extent a response is required, Microsoft responds as follows:  Microsoft admits that

according to its face, United States Patent No. 5,708,780 ("the '780 patent") is titled "Internet

Server Access Control and Monitoring," that the application that issued as the '780 patent was

8

filed on June 7, 1995 and issued on January 13, 1998.  Microsoft admits that a copy of the '780

patent purports to be attached to the Complaint as Exhibit D.  Microsoft is without knowledge or

information sufficient to form a belief regarding the remaining allegations in the unnumbered

paragraph between paragraphs 49 and 50 of the Complaint and therefore denies the same.

50.     To the extent "[t]he reexamination proceeding" in paragraph 50 of the Complaint

refers to Reexam Ctrl. No. 90/007,183, Microsoft admits that the reexamination was concluded

by a reexamination certificate confirming the patentability of the 45 original claims over the

specific prior art references cited in the reexamination petition as grounds for unpatentability.

Microsoft admits that the face of the reexamination certificate identifies over 260 prior art

references, including over 120 patent references, but Microsoft denies that the Patent Office

considered or confirmed the patentability of the claims over those references.  Microsoft denies

the remaining allegations of paragraph 50 of the Complaint.

51.     To the extent paragraph 51 of the Complaint refers to events in Reexam Ctrl. No.

90/007,183, Microsoft admits that the reexamination was concluded by a reexamination

certificate confirming the patentability of 90 new claims over the specific prior art references

cited in the reexamination petition as grounds for unpatentability. Microsoft denies the remaining

allegations of paragraph 51 of the Complaint.

52.     Microsoft admits that the '780 patent was asserted in at least one prior lawsuit in

the Eastern District of Texas.  Microsoft also admits that the Court in that case issued an order

denying summary judgment, under the law existing at that time, which has since been changed

by the Supreme Court, that claims 28 and 32-42 are indefinite.  Microsoft denies the remaining

allegations of paragraph 52.

53.     Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 53 of the Complaint and therefore denies the same.

54.     Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 54 of the Complaint and therefore denies the same.

55.     Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 55 of the Complaint and therefore denies the same.

56.     Microsoft admits that the '780 was the subject of a claim construction memorandum opinion in *Soverain Software LLC v. Amazon, Inc.*, Case No. 6:04-cv-14-LED stating:  "The Court interprets seventeen disputed terms in groups relating to: (1) path name in a URL, (2) session, (3) hypertext, (4) authentication server, and (5) means-plus-function elements."  Microsoft denies any remaining allegations of paragraph 56.

57.     Microsoft admits that the '780 was the subject of a claim construction memorandum opinion in *Soverain Software LLC v. Amazon, Inc.*, Case No. 6:04-cv-14-LED issued under the law existing at that time and stating:  "The Court agrees with Soverain that limiting the claims beyond what is disclosed in the block diagrams is not required by case law and penalizes the inventors for submitting software code during prosecution."  Microsoft denies any remaining allegations of paragraph 57.

58.     Microsoft admits that the '780 was the subject of a claim construction memorandum opinion in *Soverain Software LLC v. Amazon, Inc.*, Case No. 6:04-cv-14-LED that

included table shown in paragraph 58 of the Complaint.  Microsoft denies any remaining allegations of paragraph 58.

59.     Microsoft admits that one or more of the claims of the '780 patent recite at least one means for performing specified functions.  Microsoft denies the remaining allegations of paragraph 59.

60.     Microsoft admits that one or more of the claims of the '780 patent recite at least one claim limitation in means-plus-function format governed by 35 U.S.C. § 112, ¶ 6.  Microsoft denies the remaining allegations of paragraph 60.

61.     Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 61 of the Complaint and therefore denies the same.

62.     Microsoft denies the allegations of paragraph 62.

63.     Microsoft admits that some issued patents assigned to Microsoft have included a citation to the '780 patent as a reference.  Microsoft is without knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 63 of the Complaint and therefore denies the same.

64.     Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 64 of the Complaint and therefore denies the same.

**U.S. PATENT NO. 6,279,112**

65.     Microsoft admits that according to its face, United States Patent No. 6,279,112 ("the '112 patent") is titled "Controlled Transfer of Information in Computer Networks," that the application that issued as the '112 patent was filed on October 29, 1996 and issued on August 21, 2001.  Microsoft admits that a copy of the '112 patent purports to be attached to the Complaint

as Exhibit E.  Microsoft is without knowledge or information sufficient to form a belief

regarding the remaining allegations in paragraph 65 of the Complaint and therefore denies the

same.

66.     Microsoft is without knowledge or information sufficient to form a belief

regarding the allegations in paragraph 66 of the Complaint and therefore denies the same.

67.     Microsoft admits that some issued patents assigned to Microsoft have included a

citation to the '112 patent as a reference.  Microsoft is without knowledge or information

sufficient to form a belief regarding the remaining allegations in paragraph 67 of the Complaint

and therefore denies the same.

## U.S. PATENT NO. 6,212,634

68.     Microsoft admits that according to its face, United States Patent No. 6,212,634

("the '634 patent") is titled "Certifying Authorization in Computer Networks," that the

application that issued as the '634 patent was filed on November 11, 1996 and issued on April 3,

2001.  Microsoft admits that a copy of the '634 patent purports to be attached to the Complaint

as Exhibit F.  Microsoft is without knowledge or information sufficient to form a belief regarding

the remaining allegations in paragraph 68 of the Complaint and therefore denies the same.

69.     Microsoft admits that some issued patents assigned to Microsoft have included a

citation to the '634 patent as a reference.  Microsoft is without knowledge or information

sufficient to form a belief regarding the remaining allegations in paragraph 69 of the Complaint

and therefore denies the same.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 7,191,447

70.    Microsoft repeats and incorporates by reference each of its responses to the preceding paragraphs of the Complaint.

71.    Microsoft denies the allegations of paragraph 71.

72.    Microsoft offers a variety of services under the brand name "Bing Ads." Microsoft denies the remaining allegations of paragraph 72.

73.    Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "affiliates" as used in this paragraph and otherwise vague statements in this paragraph, Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 73 and thus denies the same.

74.    Microsoft denies the allegations of paragraph 74.

75.    Microsoft denies the allegations of paragraph 75.

76.    Microsoft denies the allegations of paragraph 76.

77.    Microsoft admits that Bing Ad services are marketed to the public in the United States.  Microsoft denies the remaining allegations of paragraph 77.

78.    For purposes of this action only, Microsoft admits that at least some Bing Ad services have been available to the public within the borders of the Eastern District of Texas. Microsoft denies the remaining allegations of paragraph 78.

79.    Microsoft denies the allegations of paragraph 79.

80.    Microsoft denies the allegations of paragraph 80.

81.    Microsoft denies the allegations of paragraph 81.

82.    Microsoft denies the allegations of paragraph 82.

83.     Microsoft denies the allegations of paragraph 83.

84.     Microsoft denies the allegations of paragraph 84.

85.     Microsoft denies the allegations of paragraph 85.

86.     Microsoft denies the allegations of paragraph 86.

87.     Microsoft denies the allegations of paragraph 87.

88.     Microsoft denies the allegations of paragraph 88.

89.     Microsoft denies the allegations of paragraph 89.

90.     Microsoft denies the allegations of paragraph 90.

91.     Microsoft denies the allegations of paragraph 91.

92.     Microsoft denies the allegations of paragraph 92.

93.     Microsoft is without knowledge or information sufficient to form a belief

regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees

for their use of the technology claimed by the '447 patent" and thus denies the same.  Microsoft

denies the remaining allegations of paragraph 93.

94.     Microsoft denies the allegations of paragraph 94.

95.     Microsoft denies the allegations of paragraph 95.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 8,606,900

96.     Microsoft repeats and incorporates by reference each of its responses to the

preceding paragraphs of the Complaint.

97.     Microsoft denies the allegations of paragraph 97.

98.     Microsoft admits that it has offered software under the name ASP.NET with

version numbers 4.5, 4.5.1, 4.5.2, 4.6, and 5 RC1.  Microsoft admits that it has offered software

under the name Windows Server version numbers 2012, 2012 R2 and 2016.  Microsoft denies

the remaining allegations of paragraph 98.

99.    Because Microsoft is without knowledge or information sufficient to form a belief

as to the scope of the term "affiliates" as used in this paragraph and the otherwise vague

language used in this paragraph, Microsoft is without knowledge or information sufficient to

form a belief regarding the allegations in paragraph 99 and thus denies the same.

100.    Microsoft denies that the cited webpage documentation located at

https://msdn.microsoft.com/en-us/library/ms178581.aspx includes the quotation attributed to it.

Microsoft denies the remaining allegations of paragraph 100.

101.    Microsoft denies the allegations of paragraph 101.

102.    Microsoft admits that the cited webpage documentation located at

https://msdn.microsoft.com/en-us/library/ms178581.aspx includes the quotation attributed to it in

paragraph 102 of the Complaint.  Microsoft denies the remaining allegations of paragraph 102.

103.    Microsoft denies the allegations of paragraph 103.

104.    Microsoft denies the allegations of paragraph 104.

105.    Microsoft denies the allegations of paragraph 105.

106.    For purposes of this action only, Microsoft admits that ASP.NET software version

numbers 4.5, 4.5.1, 4.5.2, 4.6, and 5 RC1 and Windows Server software version numbers 2012,

2012 R2 and 2016 have been available to the public within the borders of the Eastern District of

Texas.  Microsoft denies the remaining allegations of paragraph 106.

107.    Microsoft denies the allegations of paragraph 107.

108.    Microsoft denies the allegations of paragraph 108.

109.    Microsoft denies the allegations of paragraph 109.

110.    Microsoft denies the allegations of paragraph 110.

111.    Microsoft denies the allegations of paragraph 111.

112.    Microsoft denies the allegations of paragraph 112.

113.    Microsoft denies the allegations of paragraph 113.

114.    Microsoft is without knowledge or information sufficient to form a belief regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees for their use of the technology claimed by the '900 patent" and thus denies the same. Microsoft denies the remaining allegations of paragraph 114.

115.    Microsoft denies the allegations of paragraph 115.

116.    Microsoft denies the allegations of paragraph 116.

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 8,935,706

117.    Microsoft repeats and incorporates by reference each of its responses to the preceding paragraphs of the Complaint.

118.    Microsoft denies the allegations of paragraph 118.

119.    Microsoft admits that it has offered software having the name "Windows Hello" and "Windows 10 Passport." Microsoft denies the remaining allegations of paragraph 119.

120.    Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "affiliates" as used in this paragraph and the otherwise vague nature of the statements in this paragraph, Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 120 and thus denies the same.

121.    Microsoft denies the allegations of paragraph 121.

122.    Microsoft denies the allegations of paragraph 122.

123.    Microsoft denies the allegations of paragraph 123.

124.    Microsoft denies the allegations of paragraph 124.

125.    Microsoft denies the allegations of paragraph 125.

126.    Microsoft denies the allegations of paragraph 126.

127.    Microsoft denies the allegations of paragraph 127.

128.    Microsoft denies the allegations of paragraph 128.

129.    Microsoft denies the allegations of paragraph 129.

130.    Microsoft denies the allegations of paragraph 130.

131.    For purposes of this action only, Microsoft admits that software having the name "Windows Hello" and "Windows 10 Passport" has been available to the public within the borders of the Eastern District of Texas.  Microsoft denies the remaining allegations of paragraph 131.

132.    Microsoft denies the allegations of paragraph 132.

133.    Microsoft denies the allegations of paragraph 133.

134.    Microsoft denies the allegations of paragraph 134.

135.    Microsoft denies the allegations of paragraph 135.

136.    Microsoft denies the allegations of paragraph 136.

137.    Microsoft denies the allegations of paragraph 137.

138.    Microsoft is without knowledge or information sufficient to form a belief regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees for their use of the technology claimed by the '706 patent" and thus denies the same.  Microsoft denies the remaining allegations of paragraph 138.

139.    Microsoft denies the allegations of paragraph 139.

140.     Microsoft denies the allegations of paragraph 140.

## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 5,708,780

141.     Microsoft repeats and incorporates by reference each of its responses to the preceding paragraphs of the Complaint.

142.     Microsoft denies the allegations of paragraph 142.

143.     Microsoft admits that it has offered software under the name ASP.NET with version numbers 4.0, 4.5, 4.5.1, and 4.5.2.  Microsoft admits that it has offered software under the name Windows Server version numbers 2012 and 2012 R2.  Microsoft denies the remaining allegations of paragraph 143.

144.     Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "affiliates" as used in this paragraph and the otherwise vague nature of the statements in this paragraph, Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 144 and thus denies the same.

145.     Microsoft denies the allegations of paragraph 145.

146.     Microsoft admits that the text "the session ID is inserted in a particular position within the URL. The figure below shows a snapshot from a real-world site that uses cookieless sessions" and the figure included in paragraph 146 of the Complaint appear within the web page located at https://msdn.microsoft.com/en-us/library/aa479314.aspx.  Microsoft denies the remaining allegations of paragraph 146.

147.     Microsoft denies the allegations of paragraph 147.

148.     Microsoft denies the allegations of paragraph 148.

149.     Microsoft denies the allegations of paragraph 149.

150.    Microsoft denies the allegations of paragraph 150.

151.    Microsoft denies the allegations of paragraph 151.

152.    For purposes of this action only, Microsoft admits that software under the name ASP.NET version numbers 4.0, 4.5, 4.5.1, and 4.5.2 and under the name Windows Server version numbers 2012 and 2012 R2 have been available to the public within the borders of the Eastern District of Texas.  Microsoft denies the remaining allegations of paragraph 152.

153.    Microsoft denies the allegations of paragraph 153.

154.    Microsoft denies the allegations of paragraph 154.

155.    Microsoft denies the allegations of paragraph 155.

156.    Microsoft denies the allegations of paragraph 156.

157.    Microsoft denies the allegations of paragraph 157.

158.    Microsoft denies the allegations of paragraph 158.

159.    Microsoft denies the allegations of paragraph 159.

160.    Microsoft denies the allegations of paragraph 160.

161.    Microsoft denies the allegations of paragraph 161.

162.    Microsoft denies the allegations of paragraph 162.

163.    Microsoft denies the allegations of paragraph 163.

164.    Microsoft denies the allegations of paragraph 164.

165.    Microsoft denies the allegations of paragraph 165.

166.    Microsoft denies the allegations of paragraph 166.

167.    Microsoft denies the allegations of paragraph 167.

168.    Microsoft denies the allegations of paragraph 168.

169.     Microsoft is without knowledge or information sufficient to form a belief regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees for their use of the technology claimed by the '780 patent" and thus denies the same.  Microsoft denies the remaining allegations of paragraph 169.

170.     Microsoft denies the allegations of paragraph 170.

171.     Microsoft denies the allegations of paragraph 171.

## COUNT V

## INFRINGEMENT OF U.S. PATENT NO. 6,279,112

172.     Microsoft repeats and incorporates by reference each of its responses to the preceding paragraphs of the Complaint.

173.     Microsoft denies the allegations of paragraph 173.

174.     Microsoft admits that it has offered software or services under the names SharePoint Foundation 2013, SharePoint Server 2013, SharePoint Enterprise 2013, SharePoint Server 2016, SharePoint Enterprise 2016, and Office 365.  Microsoft denies the remaining allegations of paragraph 174.

175.     Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "affiliates" as used in this paragraph and the otherwise vague nature of the statements in this paragraph, Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 175 and thus denies the same.

176.     Microsoft denies the allegations of paragraph 176.

177.     Microsoft denies the allegations of paragraph 177.

178.     Microsoft denies the allegations of paragraph 178.

179.     Microsoft denies the allegations of paragraph 179.

180.    For purposes of this action only, Microsoft admits that software or services with the names SharePoint Foundation 2013, SharePoint Server 2013, SharePoint Enterprise 2013, SharePoint Server 2016, SharePoint Enterprise 2016, and Office 365 have been available to the public within the borders of the Eastern District of Texas.  Microsoft denies the remaining allegations of paragraph 180.

181.    Microsoft denies the allegations of paragraph 181.

182.    Microsoft denies the allegations of paragraph 182.

183.    Microsoft denies the allegations of paragraph 183.

184.    Microsoft denies the allegations of paragraph 184.

185.    Microsoft is without knowledge or information sufficient to form a belief regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees for their use of the technology claimed by the '112 patent" and thus denies the same.  Microsoft denies the remaining allegations of paragraph 185.

186.    Microsoft denies the allegations of paragraph 186.

187.    Microsoft denies the allegations of paragraph 187.

### COUNT VI

### INFRINGEMENT OF U.S. PATENT NO. 6,212,634

188.    Microsoft repeats and incorporates by reference each of its responses to the preceding paragraphs of the Complaint.

189.    Microsoft admits that the quoted text "Claims-based authorization is an approach where the authorization decision to grant or deny access is based on arbitrary logic that uses data available in claims to make the decision. Recall that in the case of RBAC, the only claim used was role type claim. A role type claim was used to check if the user belongs to specific role or

not." appears in the webpage located at https://msdn.microsoft.com/en-us/library/hh545448(v=vs.110).aspx.  Microsoft denies the remaining allegations of paragraph 189.

190.    Microsoft denies the allegations of paragraph 190.

191.    Microsoft admits that it has offered software or services under the name Microsoft Azure and Office 365.  Microsoft denies the remaining allegations of paragraph 191.

192.    Because Microsoft is without knowledge or information sufficient to form a belief as to the scope of the term "affiliates" as used in this paragraph and the other vague statements in this paragraph, Microsoft is without knowledge or information sufficient to form a belief regarding the allegations in paragraph 192 and thus denies the same.

193.    Microsoft denies the allegations of paragraph 193.

194.    Microsoft admits that the block quoted text in paragraph 194 appears in the webpage located at https://msdn.microsoft.com/en-us/library/ff359108.aspx.  Microsoft denies the remaining allegations of paragraph 194.

195.    Microsoft admits that the block quoted text in paragraph 195 appears in the webpage located at https://msdn.microsoft.com/en-us/library/ff359101.aspx.  Microsoft denies the remaining allegations of paragraph 195.

196.    Microsoft denies the allegations of paragraph 196.

197.    Microsoft denies the allegations of paragraph 197.

198.    Microsoft denies the allegations of paragraph 198.

199.    Microsoft denies the allegations of paragraph 199.

200.    Microsoft denies the allegations of paragraph 200.

201.    Microsoft denies the allegations of paragraph 201.

202.    For purposes of this action only, Microsoft admits that software or services under the names Microsoft Azure and Office 365 have been available to the public within the borders of the Eastern District of Texas.  Microsoft denies the remaining allegations of paragraph 202.

203.    Microsoft denies the allegations of paragraph 203.

204.    Microsoft denies the allegations of paragraph 204.

205.    Microsoft denies the allegations of paragraph 205.

206.    Microsoft denies the allegations of paragraph 206.

207.    Microsoft denies the allegations of paragraph 207.

208.    Microsoft is without knowledge or information sufficient to form a belief regarding whether "[s]everal of Microsoft's competitors have paid considerable licensing fees for their use of the technology claimed by the '634 patent" and thus denies the same.  Microsoft denies the remaining allegations of paragraph 208.

209.    Microsoft denies the allegations of paragraph 209.

210.    Microsoft denies the allegations of paragraph 210.

## **PRAYER FOR RELIEF**

To the extent that the Prayer for Relief section of the Complaint is deemed to allege any facts or entitlements to the relief requested, Microsoft denies each and every allegation. Specifically, Microsoft denies that Plaintiff is entitled to any such relief.  Microsoft further denies that any conduct on its part subjects Microsoft to liability for damages, a finding of willfulness or attorneys' fees under 35 U.S.C. § 285, or to an injunction of any kind.

## **JURY DEMAND**

Plaintiffs' jury demand does not require a response.

## II. AFFIRMATIVE AND OTHER DEFENSES

Further answering the Complaint and as additional defenses thereto, Microsoft asserts the following affirmative and other defenses, without admitting any allegation of the Complaint not otherwise admitted and without assuming the burden when such burden would otherwise be on Plaintiff.  Microsoft reserves the right to assert any other defenses that its ongoing fact investigation or discovery may reveal.

### First Defense:  Non-infringement of the Asserted Patents

1. Microsoft does not and has not in any manner infringed, either literally or under the doctrine of equivalents, either directly or indirectly, any valid claim of U.S. Patent No. 7,191,447 ("the '447 patent"), U.S. Patent No. 8,606,900 ("the '900 patent"), U.S. Patent No. 8,935,706 ("the '706 patent"), U.S. Patent No. 5,708,780 ("the '780 patent"), U.S. Patent No. 6,279,112 ("the '112 patent), and U.S. Patent No. 6,212,634 ("the '634 patent") (all collectively referred to as the "Asserted Patents"), and is not liable for infringement thereof.

### Second Defense:  Invalidity of the Asserted Patents

2. The claims of the Asserted Patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, and 112 *et seq.*

### Third Defense:  Failure to Provide Notice

3. On information and belief, Plaintiff and its predecessors-in-interest have failed to meet the requirements of 35 U.S.C. §§ 271(b) and (c), 284, and/or 287.

4. Plaintiff is not entitled to recover any damages for actions occurring prior to the filing of the Complaint.  Moreover, because the '780 patent, '634 patent, and '112 patent all expired before the filing of the Complaint, Plaintiffs are not entitled to recover any damages for

its allegations regarding those three patents.

### Fourth Defense:  Prosecution History Estoppel/Disclaimer

5.      Plaintiff's alleged causes of action for patent infringement are barred under the doctrines of prosecution history estoppel and disclaimer, and Plaintiff is precluded on that basis from claiming that one or more of the Asserted Patents cover or include any accused Microsoft method or apparatus.

6.      Plaintiff is estopped from making any assertion inconsistent with or negating any argument, representation, or position taken in the course of prosecuting the applications that issued as or are related to the Asserted Patents or in the course of reexamination or inter partes review proceedings.

### Fifth Defense:  Dedication to the Public

7.      Plaintiff has dedicated to the public any method or apparatus disclosed in the Asserted Patents but not literally claimed therein, and is estopped from claiming infringement by any such public domain method or apparatus.

### Sixth Defense:  Indispensable Parties

8.      Those parties retaining rights in the Asserted Patents are indispensable parties who must be joined.

### Seventh Defense:  Reverse Doctrine of Equivalents

9.      No relief is available to Plaintiff because Microsoft's products, software, and services operate in ways substantially different in principle from the purported invention described in one or more of the Asserted Patents, and Plaintiff cannot sustain its burden of proving otherwise.

## Eighth Defense:  Failure to State a Claim

10.     Plaintiff has failed to state a claim for infringement under 35 U.S.C. § 271.

### Ninth Defense:  Unavailability of Relief (Enhanced Damages)

11.     Plaintiff has failed to properly plead and meet the requirements for enhanced damages.

### Tenth Defense:  Unavailability of Relief (Pre-Complaint Damages)

12.     Plaintiff has failed to state a claim for pre-Complaint damages for alleged infringement of the Asserted Patents.

### Eleventh Defense:  Equitable Defenses

13.     On information and belief, Plaintiff's claims are barred, in whole or in part, by equitable doctrines, including the doctrines of waiver, acquiescence, unclean hands, and/or equitable estoppel.

### Twelfth Defense:  Lack of Knowledge

14.     To the extent that Plaintiff asserts that Microsoft indirectly infringes, either by contributory infringement or inducement of infringement, Microsoft is not liable for the acts alleged to have been performed before Microsoft knew that its actions would allegedly cause indirect infringement.

### Thirteenth Defense:  No Injunctive Relief

15.     Plaintiff is not entitled to injunctive relief because, among other reasons, any alleged injury to Plaintiff is not immediate or irreparable and because Plaintiff has an adequate remedy—if any—at law.  Moreover, Plaintiff has not specifically sought any injunctive relief in the Complaint.

## Fourteenth Defense:  Sales to United States Government

16.      Plaintiff's claims are barred, at least in part, by 28 U.S.C. § 1498.  To the extent that Plaintiff's claims relate to the sale to and/or use or manufacture by or for the United States government of the allegedly infringing products, Plaintiff's sole remedy is an action for damages filed in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1498.

## Fifteenth Defense:  Failure to Mitigate Damages

17.      Plaintiff's claims are barred, in whole or in part, by its failure to mitigate damages.  Plaintiff and its predecessors-in-interest delayed years from issuance of the patents until notifying Microsoft of allegations of infringement recited in the Complaint.

## Sixteenth Defense:  Lack of Standing

18.      Plaintiff has failed to show that it has proper standing or sufficient ownership of the Asserted Patents to seek equitable or other remedies in connection with the Asserted Patents.

## Seventeenth Defense:  Unenforceability Due to Inequitable Conduct

19.      At least the '780 patent, '900 patent, and '634 patent are unenforceable due to inequitable conduct because one or more of the named inventors, and/or the prosecuting attorneys and/or others associated with the filing and prosecution of the applications that issued as those patents failed to disclose to the U.S. Patent and Trademark Office (the "Patent Office") information that, on information and belief, they knew to be material to the patentability of the claimed "invention," with an intent to deceive the Patent Office.  Microsoft incorporates by reference each statement in its "Third Counterclaim:  Patent Unenforceability of the '780 and '900 Patents Due to Inequitable Conduct" and "Fourth Counterclaim:  Patent Unenforceability of the '634 Patent Due to Inequitable Conduct," as if fully set forth here.

20.     Because Plaintiff must have acquired any interest it might own directly or indirectly from the original assignee, the aforementioned acts of inequitable conduct necessarily must inure to the detriment of Plaintiff.

### Eighteenth Defense:  Improper Venue

21.     Venue is improper because Microsoft does not have the required "regular and established place of business" in this District.

### Nineteenth Defense:  Statute of Limitations

22.     Pursuant to 35 U.S.C. § 286, Plaintiff may not recover damages for any alleged infringement that occurred more than six years before the filing of the Complaint.

## III.   COUNTERCLAIMS

Without admitting any of the allegations of the Complaint other than those expressly admitted herein, and without prejudice to Microsoft's right to plead additional counterclaims as the facts of the matter warrant, Microsoft hereby asserts the following counterclaims against Plaintiff:

### Parties

1.     Microsoft Corporation is a Washington corporation with its principal place of business in Redmond, Washington.

2.     Soverain IP, LLC ("Plaintiff") claims to be a company with a principal place of business in McKinney, Texas.  In the Complaint, Plaintiff purports to be the "assignee" of U.S. Patent No. 7,191,447 ("the '447 patent"), U.S. Patent No. 8,606,900 ("the '900 patent"), U.S. Patent No. 8,935,706 ("the '706 patent"), U.S. Patent No. 5,708,780 ("the '780 patent"), U.S. Patent No. 6,279,112 ("the '112 patent), and U.S. Patent No. 6,212,634 ("the '634 patent") (all collectively referred to as the "Asserted Patents").

**Jurisdiction and Venue**

3.      These counterclaims arise under the Patent Laws of the United States, Title 35 U.S.C.  This Court has subject matter jurisdiction over the counterclaims under 28 U.S.C. §§ 1338, 2201, and 2202.

4.       Venue is proper under 28 U.S.C. § 1391, which still governs declaratory judgment actions involving patents, because Plaintiff is subject to personal jurisdiction in this District.

**Count I:**
**Declaratory Judgment of Patent Non-Infringement**

5.      Microsoft incorporates by reference paragraphs 1-4 above of these counterclaims as though fully repeated here.

6.      Plaintiff has alleged that Microsoft has infringed U.S. Patent No. 7,191,447 ("the '447 patent"), U.S. Patent No. 8,606,900 ("the '900 patent"), U.S. Patent No. 8,935,706 ("the '706 patent"), U.S. Patent No. 5,708,780 ("the '780 patent"), U.S. Patent No. 6,279,112 ("the '112 patent), and U.S. Patent No. 6,212,634 ("the '634 patent") (all collectively referred to as the "Asserted Patents").

7.      An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the non-infringement of the Asserted Patents.

8.      Microsoft has not infringed any valid and enforceable claim of the Asserted Patents, and is not liable for infringement thereof.

9.      Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Microsoft requests a declaration from the Court that Microsoft does not and has not infringed any valid and enforceable claim of the Asserted Patents.

10.     This is an exceptional case entitling Microsoft to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## Count II:
## Declaratory Judgment of Patent Invalidity

11.     Microsoft repeats and realleges paragraphs 1-4 above of these counterclaims as though fully repeated here.

12.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the invalidity of the Asserted Patents.

13.     At least the claims of the Asserted Patents asserted in the Complaint are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including, without limitation, one or more of 35 U.S.C. §§ 101, 102, 103, and 112 *et seq.*

14.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Microsoft requests a declaration from the Court that at least each of the claims of the Asserted Patents asserted in the Complaint are invalid for failure to meet one or more provisions of the United States Patent Laws, 35 U.S.C. § 101 *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

15.     This is an exceptional case entitling Microsoft to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## Count III:
## Declaratory Judgment of Patent Unenforceability
## of the '780 and '900 Patents Due to Inequitable Conduct

16.     Microsoft repeats and realleges paragraphs 1-4 above of these counterclaims as though fully repeated here.

17.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the unenforceability of the '780 patent and '900 patent.

18.     The '780 patent issued on January 13, 1998 from an application (the "'780 application") filed on June 7, 1995.

19.     The purported inventors named on the '780 patent are Andrew C. Payne ("Payne"), Lawrence C. Stewart ("Stewart"), Stephen Jeffrey Morris ("Morris"), Thomas Mark Levergood ("Levergood"), and George Winfield Treese ("Treese").

20.     The '780 patent is unenforceable due to inequitable conduct by each of these individuals, alone and in cooperation with others, as set forth below.

21.     At the time the '780 application was filed, the named inventors worked for Open Market, Inc. ("Open Market").  Open Market (allegedly including its patents and patent applications) was purchased by Divine Inc. in 2001.  Divine Inc. went through bankruptcy proceedings in 2003, when the '780 patent, along with other patents and applications, were allegedly purchased at an auction by Saratoga Partners, which allegedly transferred the patent portfolio in the same year to Soverain Software, LLC.  Plaintiff claims to have acquired Soverain Software LLC's patents, including the '780 patent, before filing this lawsuit.

22.     Open Market obtained the '780 in suit by deliberately and fraudulently withholding relevant, material prior art from the U.S. Patent and Trademark Office ("Patent Office") during its prosecution of those patents.  Open Market engaged in a pattern of fraudulent conduct in this regard, by systematically withholding information regarding companies and technology that Open Market allegedly considered to be its closest competition.

23.     The '780 patent purportedly claims methods and systems for maintaining a session of requests and responses between a client (such as a web browser) and a web server by appending a session identifier ("session ID") in the uniform resource locator ("URL") of a webpage.  This way, when the web browser requests page of the website and the URL of the requested page includes the session ID, the web server knows that the requests are all from the same web browser.

24.     Open Market's own documents show that it was aware of alleged competitors' public activities, publications, and software before Open Market filed the '780 application, but failed to disclose those alleged competitors, activities, publications, or software to the Patent Office.

25.     For example, on July 16, 1994, almost a year before the '780 application was filed over four months before Open Market had a commercial product of any kind, named inventor Andrew Payne sent an email to his alleged co-inventors at Open Market admitting that alleged competitor NetMarket's "on-line" system looked "almost exactly like" the demonstration system that Open Market was still just developing:

> Take a look again at:
>         http://www.netmarket.com/
> They've done a lot of work in the past few weeks. ***Their on-line
> system looks almost exactly like our demo system.***

(emphasis added).

26.     In December 1994, in drafting a funding proposal to Digital Equipment Corporation, Open Market listed NetMarket at the top of its list of alleged competitors.

27.     Open Market's documents also show that one or more of the named inventors suggested Open Market literally "steal" code to try to catch up with NetMarket.

28.     For example, on Monday, July 18, 1994, Payne included an item on his "ToDo" that Open Market should "write/steal PostScript for making inlined image buttons (like Netmarket or GNN) with arbitrary text."

29.     Similarly, another early e-commerce website was HotHotHot, an online purveyor of hot sauces.  The source code for the HotHotHot site shows that it already had functioning session IDs by July 27, 1994, almost a year before the '780 application was filed.

30.     Moreover, people at Open Market knew that HotHotHot had a functioning website using session IDs appended to URLs by September 29, 1994.  HotHotHot's website access logs show that three different computers at Open Market engaged in a series of requests with the website designed to test how its session IDs worked, including by manually changing the session IDs to see how that affected the responses.  The HotHotHot access logs show that the specific machines at Open Market that sent those requests testing the site's session IDs were the same computers from which named inventors Andrew Payne and Win Treese had been sending messages to public discussion boards during the same period.  These two left their digital fingerprints on the HotHotHot Website, showing what they knew and when they knew it.

31.     Patent applicants are required to prosecute patent applications with candor, good faith, and honesty.  This was also true at all times during the prosecution of the '780 application and '900 application.

32.     While the named inventors not only knew about NetMarket, HotHotHot, and others who had developed systems for appending session IDs to URLs to maintain a session between clients and servers, and, on information and belief, appreciated their materiality, they withheld all of this important information from the Patent Office, violating the duty of candor,

good faith, and honesty.  The motivation was clear.  Open Market wanted to own patents in the burgeoning field of e-commerce, even at the expense of those who were the true inventors.

33.     Open Market's breach of this duty of candor, good faith, and honesty, when coupled with an intent to deceive or mislead the Patent Office, constitutes inequitable conduct for the '780 patent.  In particular, Open Market, as well as subsequent purported owners of the patents and applications, failed to disclose the following references, rendering the '780 patent unenforceable against Microsoft or any other company.

    a.   The NetMarket System

    b.   The HotHotHot Website

    c.   The Condom Country Website

    d.   Glenn Crocker's Web2Mush Software

The above-listed references are sometimes collectively referred to herein as "the Undisclosed References."

34.     At least one of the named inventors of the '780 patent was aware of each of the Undisclosed References during prosecution of the application for that patent, but failed to disclose the references to the Patent Office during the '780 application process.

35.     On information and belief, at least one of the named inventors of the '780 patent knew that each of the Undisclosed References embodied or described technology that was comparable to what Open Market was trying to patent and then tried to claim in the '780 application.

36.     While the '780 application was pending, the named inventors exchanged e-mail between themselves and others at Open Market discussing the subject matter of each of these references and the pending patent application.  Open Market stored source code from at least one

of these alleged competitors (NetMarket) in Open Market's own database.  In at least one case, (NetMarket), Open Market's named inventors characterized the prima facie prior art as the equal to what Open Market was trying to do.  And for another (HotHotHot), the named inventors left tracks showing experimentation with the session IDs already in operation on the site to learn how it worked.  Yet at no time did Open Market disclose any of the Undisclosed References to the Patent Office.  This inequitable conduct renders the '780 patent unenforceable.

37.     The '900 patent attempts to claim priority to the '780 application.  The '900 patent issued on December 10, 2013 from an application (the "'900 application") filed on April 12, 2000.  The '900 application claimed to be a divisional application of U.S. Patent Application 09/005,479, which itself claimed to be a continuation application of the '780 application.  Because the '900 patent claims to have the same disclosure as the '780 application and thus to disclose the same alleged inventions, the inequitable conduct during the prosecution of the '780 application infects and taints the '900 patent, rendering it equally unenforceable.

### a:  The NetMarket Website

38.     The NetMarket Website was one of the first websites that allowed customers to make purchases using the Internet.

39.     By July 1994, a user visiting the NetMarket Website at www.netmarket.com could purchase music CDs from Noteworthy Music using his or her credit card. The NetMarket Website also used a session identifier embedded in a uniform resource locator ("URL") as part of its way of handling these transactions.

40.     The NetMarket Website was no secret. In fact, it was the featured subject of a New York Times article by noted columnist Peter H. Lewis, published on August 12, 1994 (more than ten months before the '780 application was filed), titled: "Attention Shoppers: Internet is

Open, and Secure."  Describing a customer who used the NetMarket website to purchase a music CD, the article stated, in part, that "At noon Thursday, Phil Brandenberger of Philadelphia went shopping for a compact audio disk, paid for it with his credit card and made history."

41.     This New York Times article described the NetMarket Website technology in sufficient detail to make clear that the website used public key cryptography in combination with a version of Mosaic, which was then a popular browser for the World Wide Web.

42.     The same day that this New York Times article was published, its full text was circulated at Open Market in an email that acknowledged that NetMarket "sounds like a very real competitor to Open Market," and noted that Open Market would "need to keep this little company in mind as we develop positioning, a competitive matrix, etc."

43.     On information and belief, Treese received a post made by Daniel Kohn to the comp.infosystems.announce newsgroup on or about July 21, 1994, describing the NetMarket Website, including the ability to purchase CDs from Noteworthy Music.

44.     The NetMarket Website is prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of the claims that Open Market was then seeking to obtain in the Patent Office.

45.     The Patent Office granted reexamination of the '780 patent based on a single help file published at the NetMarket Website.

46.     During the prosecution of the '780 application, one or more of the inventors and/or the prosecuting attorneys associated with the filing and prosecution of the application was aware of a method and system for conducting commercial transactions over the Internet that had been publicly implemented in July 1994 by The NetMarket Company.

47.     As noted above, Open Market was well aware of the NetMarket Website before Open Market filed the '780 application.  On information and belief, each of the named inventors committed inequitable conduct in not disclosing the NetMarket Website and its public use to the Patent Office during the prosecution of the '780 application.  On information and belief, each of these individuals knew that the NetMarket Website was a material reference, but withheld it with intent to deceive.

48.     Named inventor Andrew Payne ("Payne") became aware of the NetMarket Website at least as early as June 15, 1994, when he examined the website located at http://www.netmarket.com, and sent an email message to Lawrence Stewart (another named inventor) at stewart@openmarket.com, stating in relevant part:

> Check out: http://www.netmarket.com/about.html There's an item about security and how they take credit card numbers, host based access control, etc.

49.     On or about July 1, 1994, Payne added the HTML source code for the home page of http://www.netmarket.com into Open Market's "Revision Control System."

50.     On or about July 16, 1994, Payne sent an email mail message to tech@openmarket.com with the subject line "Competitor" that included the following text:

> Take a look again at: http: //www.netmarket.com/ They've done a lot of work in the past few weeks. Their on-line system looks almost exactly like our demo system!!

51.     On or about July 18, 1994, Payne created a "To do" list containing the following text:

> TODO revl.1 Mon Jul 18 14:40:11 1994 1 This is Andy's 'punch list" from the July 15th demo write/steal PostScript for making inlined image buttons (like NetMarket or GNN) with arbitrary text.

The July 18, 1994 email illustrated Open Market's willingness to take technology from others who invented it first.

52.     In July 1994, one or more named inventors examined the NetMarket website at http://www.netmarket.com.

53.     On or about July 20, 1994, Payne sent an electronic mail message to Gail Grant at the address grant@pa.dec.com that stated:

> Have you looked at Netmarket (www netmarket.com)? I've been watching them, and of anyone I've seen, they're the closest to what we're doing. They capture credit card info, have a way of composing orders, have plans to use PGP for encrypting stuff have a restricted version of Lynx that you can telnet to browse their stuff, etc., etc. It looks like they are on the ball ....

54.     On or about July 20, 1994, Payne sent an electronic mail message to treese@openmarket.com and stewart@openmarket.com at the address grant@pa.dec.com that shows that the people at NetMarket knew that Open Market was watching and reviewing NetMarket's source code:

> The folks at 'netmarket.com' seem to be on the ball. They have HTML comments in their sources:
> <:!---------------------------------------------------------------:>
> <:!-- Hello unknown@aegean.opennrarket.com! --:>
> <:!-- Thank you for reading our sources! --:>
> <:!-- --:>
> <:!-- Today is: Wed Jul 20 16:54:21 EDT 1994 --:>
> <:!-- Today's randomly selected fortune is: --:>
> <:!-- 'Yeah, you want to trade your hair for some phlegm.' --:>
> <:!-- - Jerry, trying to get a --:>
> <:!-- better babka, in 'The --:>
> <:!-- Dinner Party', _Seinfeld_ --:>
> Cute.
> Also, from their "about Netmarket" page:
> >NetMarket is porting ViaCrypt's commercial PGP to our flavor of Unix
> >and will support PGP communications as soon as ViaCrypt delivers the
> >newest version to us. In addition, clients will have the option to
> >limit the hosts (either by domain names, IP numbers or both) from which
> >NetMarket orders can be transmitted, adding another layer of protection.

55.     On or about July 20, 1994, Lawrence Stewart ("Stewart") forwarded the electronic mail message identified in the preceding paragraph to omi.intelligence@openmarket.com with the subject "NetMarket progress."

56.     In August 1994, one or more of the '780 patent named inventors evaluated the secure electronic commerce capabilities of the NetMarket Website.

57.     On or about August 15, 1994, Winfield Treese ("Treese") authored a document entitled Cryptography Notes, dated August 15, 1994, stating that "NetMarket is using PGP for web-based transactions ..."

58.     "PGP" stands for "Pretty Good Privacy," a software program which at that time allowed computer users to encrypt information using a technology known as public key cryptography.

59.     On or about September 2, 1994, Payne sent an electronic mail message to staff@netmarket.com that included the text: "Have you gotten much business from folks with PGP capable Mosaic browsers?"

60.     On or about, September 2, 1994, Payne sent an electronic mail message to Henry Houh at MIT that included an address for the NetMarket website with a session identifier in the URL (namely, the URL http://www.netmarket.corn/netmarket/bin/press/:st=hjirwulincgJ2).

61.     On or about September 2, 1994, Payne sent an electronic mail message to omi.intelligence@openrnarket.com with the subject "Internet Credit Card" that included the following text:

> At NetMarket:
> http://www.netmarket.com/netmarket/bin/press/:st=hjvwulincgl2
> >NetMarket is also working with other partners to take public-key
> >encryption to the next logical level, The Internet Credit Card.

62.     On or about September 3, 1994, Payne had a telephonic discussion with Daniel Kohn, CEO and founder of NetMarket regarding the function of the NetMarket Website, and Payne sent notes from this call to all@openmarket.com.

63.     On or about March 17, 1995, an electronic mail message was sent to all@openmarket.com that included the following text confirming that Open Market and at least one of the named inventors of the '780 application knew that NetMarket was already using session identifiers in the URL to track visitors to web pages:

> >> After reading yesterday's news about NetMarket I decided to re-visit. While there I noticed they seem to have a primitive session ID system which tracks which pages people visit. No error checking seems to be done on this field (which is even called sid in the url) since I was able to change it and the page happily reloaded. See: http://netmarket.con/nrn/pages/demoinfo?sid=Qw8aJtLc4b . [perry]

64.     On information and belief, "all" in the address all@openmarket.com indicates that the message was sent to all of the company's employees, including all of the named inventors.

65.     In late 1994, NetMarket's headquarters was relocated to Cambridge, Massachusetts, within several blocks of Open Market's headquarters.  On information and belief, Open Market employees, including the named inventors, continued to monitor the NetMarket Website and communicate with NetMarket employees through at least 1996.

66.     The NetMarket Website was identified on the Commercial Sites Index that Open Market operated while the '780 application was pending.

67.     On information and belief, Treese, Payne, Mackie, and Stewart each knew, prior to the issuance of the '780 patent, that NetMarket had operated a website long before the filing of the '780 application, through which customers could make purchases using the Internet, including purchasing music CDs from Noteworthy Music.  Each of these individuals also knew

40

that NetMarket has used a session identifier embedded in a URL on that NetMarket Website long before the filing of the '780 application.

68.     On information and belief, Treese, Payne, Mackie, and Stewart failed to disclose their knowledge of the NetMarket Website to the Patent Office before the '780 and patent issued.

69.     On information and belief, each did so with knowledge that the information about the NetMarket Website was material, since each knew that the NetMarket Website technology predated and closely competed with what Open Market was seeking to patent.

70.     No person responsible for the prosecution of patent applications in question informed the Patent Office of the existence and operation of the NetMarket Website prior to the issuance of '780 patent.

71.     The NetMarket Website information was material, at least in part because it renders at least one claim in the '780 invalid, including claim 1.

72.     The failure by Open Market to disclose information about the NetMarket Website renders the '780 patent unenforceable.

### b. The HotHotHot Website

73.     As early as July 1994, a company in Pasadena, California named Altadena Instruments developed the source code to operate a fully functional e-commerce website, including using virtual shopping carts to store selected products and session IDs in URLs to maintain a session of requests between the customer's web browser and the website's web server.  Altadena's first project was applying that source code to operate a website for a local hot sauce company named HotHotHot.  The source code for the HotHotHot Website was maintained on backup tapes by an Altadena developer named Thomas Soulanille, who was one of the developers of the technology.  Mr. Soulanille produced the source code dated July 19, 1994,

September 6, 1994, and November 17, 1994 in a previous lawsuit by Soverain Software, LLC

against Amazon.com ("the Amazon.com Litigation").  The source code was produced with no

confidentiality designation.

74.     The earliest of these source code versions, from July 1994, shows that Altadena

had already completed the source code necessary for receiving a request for a web page from the

client browser sent using the hypertext transfer protocol (HTTP), generating a session ID to be

used for the session with that client, and appending that session ID into the URLs of links on the

requested webpage so that subsequent requests from the browser would include the session ID in

the URL of the requested link.  This session code was contained within a file named alta_state.c.

Thus, the July 1994 Altadena source code shows that the company had already created and

reduced to practice at least what Open Market would later claim to patent as claims 1 and 22 of

the '780 patent, and Altadena did so nearly a year before Open Market filed its '780 application.

75.     At least by September 28, 1994, the HotHotHot Website, running that Altadena

source code, was available to be accessed by the public and was selling hot sauces through that

website.  The source code produced by Mr. Soulanille includes server log information in a file

named access_log showing each request from client browsers to the HotHotHot web server for a

period of time that includes September and October 1994.  For each request, the log files show,

among other information, the specific web page requested, the IP address of the client browser,

the date and time, and the session ID.  Reviewing these log files shows that the HotHotHot

website was receiving public requests from web browser clients by September 28, 1994, and that

these requests included multiple requests from a common client using the same session ID,

further illustrating the operational functionality of the session ID technology developed by

Altadena.

76.     At least some of the named Open Market inventors of the '780 patent knew about the HotHotHot Website and its session ID functionality the day after its public launch.  The HotHotHot web server logs from 1994 show many requests in the three day period of September 29-October 1, 1994, from three separate computers at Open Market, including requests in which the operator of the browser was manually changing the session ID to test how the HotHotHot Website server and its session ID code would respond.

77.     The named inventors of the '780 patent left their digital fingerprints on the HotHotHot Website, including on the specific requests they made to the website during these three days.  As the log file proves, most of the requests from Open Market during that three-day period, including those probing how the site's session ID functioned, came from a computer with the name "aegean.openmarket.com."  On information and belief, these requests were sent to the HotHotHot Website by '780 patent named inventor Andrew Payne, because the "aegean.openmarket.com" computer from which these requests came was the same one Payne used to send postings to public computer-related forums, such as UseNet and Google Groups.[1]

78.     The requests from the "aegean.openmarket.com" show how the person operating the browser at Open Market browsed the site and explored its session ID functionality.  For example, in a series of requests from that computer on September 29, 1994, the user of the web browser on that computer requested the front page of the HotHotHot Website, which resulted in the server sending that page back to the client with a session ID appended in the URLs of the links on the page.  A few minutes later, the same machine requested the website's catalog page

---

[1] E.g., http://groups-beta.google.com/group/biz.jobs.offered/msg/dde6868550d2795a; http://groups-beta.google.com/group/comp.software.testing/msg/ 4d9b79abd97c7eaf?dmode=source.

using a URL that included that same session ID, and the web server returned the catalog page.  A few minutes later, the same Open Market machine sent a third request for the website's instructions page, but the request did not include the session identifier, suggesting that the user had manually requested the page without the session ID in the link of the page it just received. Because the request did not include the session ID, the HotHotHot Website created a new session and returned the requested page with a new session ID.  A few minutes after that, the same Open Market computer sent a request with a different session ID that had not been created or provided by the server.  This request appears to have been a test by the person operating the aegean.openmarket.com computer (presumably Payne) to see how the HotHotHot Website server would respond to requests that contained a false or "bogus" session ID.  In response, not recognizing the session ID presented by the client as one it had generated, the HotHotHot web server generated a new session ID and provided the requested page but now with URLs containing the new server-generated session ID.  Thus, at least by September 29, 1994, on information and belief as shown by the server log, not only did Payne know about the HotHotHot Website, but he had tested the session ID functionality to see how it worked in various scenarios and had used the HotHotHot Website to practice the method that Open Market would later purport to claim for itself in '780 patent claim 1.

79.    Requests to the HotHotHot Website during this three-day period also came from a machine named "cirocco.openmarket.com," which appeared to be the computer used by named inventor Win Treese given that he had used that same computer to send public postings.[2]  Further requests came from a third Open Market machine named "gate3.openmarket.com."

---

[2] E.g., http://groups-beta.google.com/group/rec.arts.bonsai/msg/a74573551c33cf9a?dmode=source.

80.    The intelligence gained by Open Market from its probing of the HotHotHot Website and its session IDs even made it into the '780 application.  Specifically, the '780 application, filed nearly nine months after this probing, included flow charts indicating that if the request contained no session ID, or if it contained a session ID that was not valid and recognized by the server (such as the bogus session ID sent by the aegean.openmarket.com machine to the HotHotHot Website), the '780 application method would go through a process, just like the HotHotHot Website did, that ended with generating a new session ID.  *See* '780 patent, Fig. 2A, reference numbers 104 and 110.

81.    On or about September 29, 1994, Payne confirmed his knowledge of the HotHotHot Website and its session ID functionality in an electronic mail message to tech@openmarket.com stating that the HotHotHot website contained "one implementation of shopping carts" and that it appeared to use session identifiers embedded in a URL.

82.    On information and belief, one or more of the other named inventors on the '780 patent received this September 29, 1994 message from Payne.

83.    The source code produced by Mr. Soulanille showing the invention of the HotHotHot Website can be used to recreate the website and visually illustrate its use of session IDs, as the users of the Open Market machines would have seen when they visited and tested the website on September 29, 1994.  During the Amazon.com Litigation, expert Justin Erenkrantz performed such re-creations and created movies showing the functionality, as he discussed in his non-confidential deposition transcript dated May 13, 2005.  The movies also use the server logs to show the precise series of requests made by the Open Market computer (used by Payne) on September 29, 1994 probing the HotHotHot Website and the web pages, URLs (including session IDs) that would have been seen by the person making those requests.

84.     Mr. Soulanille also testified in his non-confidential deposition of March 14, 2005 in the Amazon.com Litigation about how the HotHotHot session IDs functioned in July and September 1994, further evidencing that the website at least performed the method of claim 1 of the '780.  Furthermore, the access logs produced by Mr., Soulanille as part of the HotHotHot source code further evidence that the HotHotHot web server performed logging of client requests related to web pages, making the website material to '780 patent claim 22 as well.

85.     Because the HotHotHot Website implemented session identifiers embedded in a URL and included all of the other purported claim elements, the HotHotHot Website was material to the patentability at least claims 1 and 22 of the '780 patent.

86.     The HotHotHot Website is prior art that should have been disclosed to the Patent Office because it would have resulted in the rejection of claims in the '780 application that Open Market sought to obtain in the Patent Office, including what issued as claims 1 and 22 of the '780 patent.

87.     On information and belief, at least named inventors Payne, Stewart, and Treese committed inequitable conduct in not disclosing the HotHotHot Website, its public use, and its session ID functionality to the Patent Office during the prosecution of the '780 patent.  On information and belief, each of these individuals knew that the HotHotHot Website was material prior art, but withheld it with intent to deceive.

### c. The Condom Country Website

88.     In 1994, using the domain name nfic.com, the New Frontiers Information Corporation designed a website for selling products over the Internet. The website operated under the trade name "Condom Country" at the URL http://www.ag.com/condom/country.  The successor to this website is still in operation today at the URL http://www.condom.com.

89.     Condom Country began offering products for sale over the Internet in September 1994 using session IDs in URLs to maintain session state during multiple requests from the same client.  At least two of the '780 patent named inventors knew of the website, had visited it, and would have seen the session IDs in the URLs of the pages during those visits, but failed to disclose the Condom Country Website at any time during the prosecution of the '780 application, which was not filed until June 1995, approximately nine months later.

90.     On or about September 26, 1994, Christian Hamer announced the opening of Condom Country in a post to the Usenet newsgroup comp.infosystems.www.misc.

91.     At least by September 27, 1994, Treese became aware of the Condom Country Website.  See Soverain Software's Supplemental Response to Amazon.com's Interrogatory No. 22 in Amazon.com Litigation, p. 5 (March 21, 2005, no confidentiality designation).

92.     On September 29, 1994, Payne wrote an e-mail to Kim Alley at Open Market noting that he had updated the listing for the "Condom Country" website in the Commercial Sites Index that Open Market maintained.  Referring to the Index, Payne wrote: "By the way, we've got a new entry under 'sex' (Condom Country). Didn't you know someone who wanted to sell condoms on the Internet? Anyway, I had to make a little editorial decision to remove some explicit wording from their what's new announcement."  Soverain Software has also admitted that Payne was aware of the Condom Country Website at least by September 30, 1994.  Soverain Software's Supplemental Response to Amazon.com's Interrogatory No. 22 in Amazon.com Litigation, p. 5 (March 21, 2005, no confidentiality designation).

93.     On or about October 2, 1994, Payne received an electronic mail from Henry Houh that stated:  "On another issue, do you suppose you will have HTML markup stuff to spin off? I

am thinking of this new company "nfic.com" that now has their own Tl. They're a bunch of MIT

folk, (they did the condoms company)."

94.     The Condom Country Website used a session identifier embedded in a URL.

During the Amazon.com Litigation, the source code for the Condom Country Website was

produced, and the owner of the Condom Country Website and its source code confirmed in

writing that the source code, any supporting documents, and any deposition testimony of its

inventors and developers have no confidentiality.  The Condom Country Website was re-created

during the Amazon.com Litigation by expert Justin Erenkrantz using the source code from

September 1994.  A movie showing the operation of that re-created website running the

September 1994 source code shows how it uses a session ID in a URL to maintain session state

through multiple requests from the same client.  That movie shows what the named inventors of

the '780 patent would have seen, including the session IDs, when they visited the website in

September 1994.  The developer of the website, Bob Ramstad, testified in his deposition during

the Amazon.com Litigation that the movie showing the re-created website accurately showed

how the website functioned in September 1994.

95.     The Condom Country website source code produced during the Amazon.com

Litigation shows how by September 1994, the website performed the steps of receiving a request

for a web page from the client browser sent using the hypertext transfer protocol (HTTP),

generating a session ID to be used for the session with that client, appending that session ID into

the URLs of links on the requested webpage so that subsequent requests from the browser would

include the session ID in the URL of the requested link.  For example, upon initial entry to the

Condom Country site, a random ticket identifier would be assigned to the individual user using

the db_verify_user function in db_tag.pc, which would then allocate a new session ID from the

tag-userid Oracle sequence.  Once the unique session ID was assigned, the tag program would append the session ID to all URLs that were returned on the page.  When a request with a session ID was received by the web server, the server performed validity checking to ensure that the machine from which the session identifier originated was the current machine sending the request and that the last access using that session ID was within the past 43.2 minutes.  Thus, any user visiting the Condom Country Website in September 1994, as Payne and Treese apparently did, would have caused the purported practice of at least claim 1 of the '780 patent.

96.     The Condom Country Website also tracked requests in a log stored in a database named tag_history.  The log entries included the IP address of the client, a time stamp, the requested web page, and the session ID.  Thus, any user visiting the Condom Country Website in September 1994, as Payne and Treese apparently did, would have also caused the practice of at claim 22 of the '780 patent.

97.     The Condom Country website is prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of at least claims 1 and 22 of the '780 Patent.

98.     On information and belief, at least Payne committed inequitable conduct in not disclosing the existence of the Condom Country Website (which Open Market listed in its own Commercial Sites Index) to the Patent Office during the prosecution of the '780 patent. On information and belief, each of these individuals knew that the Condom Country Website was a material reference, but withheld it with intent to deceive.

### d.  Glenn Crocker's Web2Mush Software

99.     In October of 1994, many members of the World Wide Web community came together at the Second International Conference on the World Wide Web in Chicago, Illinois.

100.     One of the papers published at the Second International Conference on the World Wide Web was Glenn Crocker's paper "web2mush: Serving Interactive Resources to the Web." This paper discusses mechanics for embedding an authorization identifier in a URL.

101.     Glenn Crocker's work was already known to Open Market, including in particular Payne, Stewart, and Treese.

102.     In July of 1994 (on or about July 8), Payne reviewed a posting that Glenn Crocker had made to the Usenet newsgroup comp.infosystems.www.providers ("Crocker's post").  This posting announced a web interface for the TinyMUSH server.  TinyMUSH was a multi-user communication system used for games, and the web2mush software provided authentication controls in a World Wide Web environment.  As stated in the Abstract to the web2mush paper Crocker presented at the World Wide Web Conference in Chicago, "Web2mush is a system of programs working together which make access to TinyMUSH systems available to users of the Web through the richer Web interface."

103.     The software for web2mush was available for download through the URL http://stratus.cwru.edu/ beginning in July 1994.

104.     On or about July 9, 1994, Payne forwarded excerpts of Crocker's post to others at Open Market using all@OpenMarket.com and David Gifford, with this commentary (emphasis added):

> >From comp.infosystems.www.providers, somone else has figured out
> how to put stuff in URLs for access control:
>
> >I've written a Web<-->TinyMUSH interface that handles 'interactive"
> >sessions by overloading the use of Reload. *It also handles security*
> >*by first authenticating to the TinyMUSH server, then providing a chain*
> >*of unique random numbers imbedded in URL's to keep peoples sessions*
> >*separate.* It is located at:
> >http://stratus.cwru.edu/
> []

50

"Gawd"

105.     The someone in "somone else has figured out how to put stuff in URLs for access control" was Crocker.

106.     As Payne's emphatic response ("Gawd") to Crocker's work suggests, one or more claims '780 patent, including at least claim 1, would not have been allowed if Open Market had disclosed Glenn Crocker's Web2Mush Software to the Patent Office.

107.     On information and belief, the named inventors of the '780 patent (including at least Payne and other recipients at all@openmarket.com) committed inequitable conduct in not disclosing the existence of the Web2Mush Software to the Patent Office during the prosecution of the '780 patent.  On information and belief, each of these individuals knew that the Web2Much was a material reference, but withheld it with intent to deceive.

108.     The instances of inequitable conduct discussed above that occurred during the '780 application, both individually and collectively, render the '780 patent unenforceable. Furthermore, because the '900 patent claims to be related to the '780 application through a continuation application and purportedly contains substantially the same specification, the doctrine of infectious unenforceability renders the '900 patent equally unenforceable due to the inequitable conduct committed during the '780 application.

**Count IV:
Declaratory Judgment of Patent Unenforceability
of the '634 Patent Due to Inequitable Conduct**

109.     Microsoft repeats and realleges paragraphs 1-4 and 16-108 above of these counterclaims as though fully repeated here.

51

110.    An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the unenforceability of the '634 patent.

111.    The '634 patent issued on April 3, 2001 from an application (the "'634 application") filed on November 15, 1996.

112.    The purported inventors named on the '634 patent are Daniel E. Geer, Jr. ("Geer") and Henry R. Tumblin.

113.    At the time the '634 application was filed, the named inventors worked for Open Market.

114.    Open Market obtained the '634 patent by deliberately and fraudulently withholding relevant, material prior art from the Patent Office during its prosecution of that patent.

115.    The abstract of the '634 patent describes the patent as follows:

A system for certifying authorizations includes an authorizing computer and an authorized computer interconnected by a computer network. The authorizing computer creates a public key pair comprising a new public key and a new private key, and creates an authorization certificate that certifies that a holder of the authorization certificate is authorized to perform an action referred to in the authorization certificate. The authorization certificate includes the new public key. The authorizing computer causes the authorization certificate and the new private key to be transmitted to the authorized computer. The authorized computer receives the authorization certificate and the new private key and decrypts messages using the new private key as evidence that the authorized computer has obtained the authorization certificate legitimately.

116.    Claim 4 of the '634 patent states:

A method for certifying authorizations in a system comprising an authorizing computer and an authorized computer interconnected by a computer network, the method comprising the steps of:
creating, at the authorizing computer, an authorization certificate that certifies that a holder of the authorization certificate is authorized to perform a

particular action specified in the authorization certificate, the authorization certificate having a file structure that supports critical components and extension components;

causing the authorization certificate to be transmitted to the authorized computer, the authorized computer being programmed to accept certificates having file structures that support critical components and extension components when the authorized computer is programmed to accept the critical components but to reject certificates having file structures that support critical components and extension components when the authorized computer is not programmed to accept the critical components; and

including information unique to the particular action specified in the authorization certificate as at least one critical component of the authorization certificate in order to prevent the authorization certificate from being accepted by computers that are not programmed to accept the information unique to the action referred to in the authorization certificate.

117.    On July 11, 1995, over sixteen months before the '634 application was filed, a technical paper titled *iKP - A Family of Secure Electronic Payment Protocols*, authored by Mihir Bellare and Juan A. Garay of the IBM T.J. Watson Research Center and Amir Herzberg, Hugo Krawczyk, Michael Steiner, Gene Tsudik, and Michael Waidner IBM Zurich Research Laboratory (hereafter the "iKP Article"), was published and presented at the First USENIX Workshop on Electronic Commerce in New York City.  A copy of the iKP Article is available at

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwjc77y xxafUAhUB8mMKHVrEAd4QFggrMAA.

118.    Author Hugo Krawczyk made the presentation regarding the iKP Article before the crowd of attendees of the workshop.  A summary of the full proceedings of this workshop can be found at

https://www.usenix.org/legacy/publications/library/proceedings/ec95/digest.html.

119.    The iKP Article describes a method that teaches to skilled artisans all of the elements of at least claim 4 of the '634 patent.  For example, the article describes protocols for secure transactions between three parties connected by a computer network: customer

(authorizing computer), merchant, and acquirer (merchant bank; authorized computer).  In the

iKP Article method, the customer (authorizing computer) creates an authorization certificate

(*see, e.g.*, "SLIP" as defined in Figure 5 of the article) authorizing a merchant bank (holder of the

authorization certificate) to debit the customer's account.  The SLIP authorization certificate has

a file structure that includes critical components and extension components.  The authorization

certificate is then transmitted to the acquirer (an authorized computer), which has programming

to accept certificates that support critical and extension components, and to reject certificates

when the acquirer (authorized computer) does not accept the critical components.  The customer

has authorized payment to a certain merchant who is known to the acquirer. Upon allowing

payment, the acquirer must be convinced that the payment is indeed being made to the right

merchant, and not some imposter.

120.    The iKP Article was material prior art to the '634 patent and should have been

disclosed to the Patent Office because it would have resulted in the amendment or rejection of at

least claim 4 of the '634 patent.

121.    On information and belief, the iKP Article was known to the named inventors of

the '634 patent and others at Open Market at the time of the '634 application.  Named inventor

Geer was Program Chair of the conference at which the iKP Article was published and presented

and gave his opening remarks on the same day of iKP Article presentation.  According to the

account of the conference "Program Chair Dan Geer set the tone for the conference by

requesting that participation be spirited, stressing the urgency of solving electronic commerce

problems before the 'cumulative investment' of the Internet, more commercial than ever, pins

down policies that might wreak havoc with privacy, security, and needed functionality."

Furthermore, as Program Chair, papers for the conference, such as the iKP Article were sent to

Geer, as stated in the submission guidelines at:

https://www.usenix.org/legacy/publications/library/proceedings/ec95/call.html

122.    In addition to '634 patent named inventor Geer, others from Open Market presented their own paper at the same conference.  Specifically, shortly before Hugo Krawczyk presented the iKP presentation, Open Market's David Gifford, Lawrence Stewart, Andrew Payne, and Win Treese presented their paper titled *Payment Switches for Open Networks* to the same audience.  Upon information and belief, all of these Open Market individuals were present for Geer's opening remarks, the Open Market presentation, and then Mr. Krawczyk's iKP presentation.

123.    Given his involvement as Program Chair of the July 11, 1995 USENIX conference and his presumed knowledge of the subject matter regarding authorization certificates for secure transactions, on information and belief, at least named inventor Geer must have understood the materiality of the iKP Article to the claims being sought during the '634 application.

124.    Despite this knowledge, neither Geer nor anyone else associated with the filing and prosecution of the '634 application ever disclosed the iKP Article to the Patent Office while this application was pending.  However, the named inventors did disclose to the Patent Office during the '634 application Open Market's own paper that was presented at the same conference, *Payment Switches for Open Networks*.  On information and belief, the withholding of the iKP Article from the same conference was done with intent to deceive the Patent Office.

125.    This withholding of the iKP Article from the Patent Office at least by named inventor Geer while the '634 application was pending constitutes inequitable conduct, which renders the '634 patent unenforceable.

IV.     **PRAYER FOR RELIEF**

WHEREFORE, Microsoft prays for the following relief:

A.      A dismissal of Plaintiff's Complaint with prejudice and a complete denial of Plaintiff's requests for damages, injunctive relief, interest, costs, expenses, an accounting, attorneys' fees, and any other form of relief;

B.      A judgment declaring that any asserted claims of the Asserted Patents are invalid and/or not infringed by Microsoft;

C.      A judgment declaring that the '780 patent, '900 patent, and '634 patent are unenforceable due to inequitable conduct before the Patent Office;

D.      A judgment that, pursuant to 35 U.S.C. § 285 and/or other applicable laws, Plaintiff's conduct in commencing and pursuing this action renders this an exceptional case, and that Microsoft be awarded its costs and reasonable attorneys' fees, together with interest, including prejudgment interest, thereon; and

E.      Such other and further relief as may be deemed just and appropriate.

V.      **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Microsoft Corporation respectfully demands a jury trial on all issues so triable to a jury.

Dated:  June 12, 2017                    Respectfully submitted,


By:     */s/ J. Christopher Carraway*
        J. Christopher Carraway (OR Bar No. 961723)
        Email:  chris.carraway@klarquist.com
        Todd M. Siegel (OR Bar No. 001049)
        Email:  todd.siegel@klarquist.com
        KLARQUIST SPARKMAN, LLP
        121 SW Salmon Street, Suite 1600
        Portland, OR  97204
        Telephone:  503-595-5300

56

Facsimile:  503-595-5301

Counsel for Defendant
MICROSOFT CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 12, 2017 a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

By:   */s/ J. Christopher Carraway*
      J. Christopher Carraway (OR Bar No. 961723)
      Email:  chris.carraway@klarquist.com
      KLARQUIST SPARKMAN, LLP
      121 SW Salmon Street, Suite 1600
      Portland, OR  97204
      Telephone:  503-595-5300
      Facsimile:  503-595-5301

      Counsel for Defendant
      MICROSOFT CORPORATION

1